(Superior Court of Cincinnati.)
Special Term, September, 1900.

SAMUEL H. TAFT v. THE FOURTH NATIONAL BANK et al.

----

(1).  A preference given by an insolvent debtor to a creditor within four months of the filing of a petition in bankruptcy can not be avoided, unless it appear that at the time of receiving the preference the creditor had knowledge of some fact or facts calculated to produce in the mind of an ordinary intelligent man a belief that the debtor is insolvent.

(2).  Constructive notice is a sufficient ground for such a belief; but the circumstances upon which notice is predicated must be of a character to induce belief as distinguished from suspicion.

DEMPSEY, J.

The question at issue in this case arises, as a consequence of a bill of interpleader filed by plaintiff, between the defendants, John Weld Peck (trustee), the Fourth National Bank.and C. Crane & Co., and it is sought by said trustee to recover from said bank and said Crane & Co. the amount of a certain indebtedness paid to said Crane & Co. by the H. C. Maxwell Co., bankrupts, for whom Peck is trustee in bankruptcy, on the ground that the same was a preference in violation of the bankrupt act, and made within four months previous to petition filed against the bankrupts. So far as the Fourth National Bank was concerned, the claim against it was abandoned by the trustee.

Section 60 of the present bankrupt act is as follows:

"Preferred creditors: (a). A person shall be deemed to have given a preference if, being insolvent, he has procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class.

"Preference when given: voidable. (b). If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of a petition and before the adjudication, and the person receiving it or to be benefited thereby, or his agent acting therein, shall have reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person.

"In order that a transfer shall constitute a preference which may be avoided, four elements are necessary: First, the transfer must be made from an insolvent person to a creditor; second, the effect of such transfer must be to enable the creditor to obtain a greater percentage of his debt than any other creditor of the same class; third, the person receiving the transfer, or to be benefited by it, or his agent acting therein, must have had reasonable cause to believe that it was intended thereby to give a preference; fourth, the transfer must have been made within four months before filing a petition in bankruptcy, or after filing the petition and before the adjudication." Loveland on Bankruptcy, section 194.

In the case at bar, as the evidence discloses. the first, second and fourth elements above are practically admitted or established. The disposition of the case depends upon the effect of the evidence in the case in establishing the third element.

Under this element, it is necessary to establish that the creditor, at the time of receiving the transfer,must have had reasonable cause to believe that a preference was intended to be given. This element includes within itself two subordinate factors, (1) the creditor must have reasonable cause to believe that the debtor is insolvent; and, (2) also to believe that he is to receive a greater percentage of his debt than other creditors of the same class. Loveland on Bankruptcy, section 194, p. 468.

To my mind it is clear that the second subordinate factor must result if it be established that the first (reasonable cause to believe insolvency) existed. And as to this first factor, Loveland lays down the rule (p. 468) that it is not necessary that the creditor know or even actually believe that a preference is being given, provided he has reasonable cause to be put upon inquiry as to whether a preference is actually given or not. Constructive notice is sufficent, upon the ground that when a party is about to perform an act by which he has reason to believe that the rights of a third party may be affected, an inquiry as to the facts is a moral duty, and diligence an act of justice. The decision of Mr. Justice Bradley, in Grant v. National Bank, 97 U. S., 81, is then quoted at length, wherein that learned judge distinguishes between "belief" and "suspicion" as to insolvency, concluding with the deduction that reasonable cause to believe a debtor insolvent means that there must be knowledge of some fact or facts calculated to produce such a belief in the mind of the ordinary intelligent man.

Accepting Justice Bradley's conclusion as the true test, let us see what will be its effect when considered in connection with the evidence in this case. These facts appear to be undisputed from the evidence: The H. C. Maxwell Co. was a hopelessly insolvent concern for at least six months prior to July 11, 1899; on that day the company was adjudged a bankrupt by the United States District.Court, and subsequently Mr. Peck was elected trustee in bankruptcy. On the 10th of April, 1899. the company had sold, after advertisement by circulars, etc., all of its stock of merchandise on hand, lumber that was unfinished, and lumber that was made up into sashes, doors and blinds, to Samuel H. Taft for $2,900, which was paid in four notes from Taft, three of them for $900 each, and one for about $200, the balance. It should have been stated that this company was operating a planing mill, or window and sash factory. On August 3, 1899, in a suit brought by Johnson et al. against the company its plant was levied on, and

on May 13, all of its stock of machinery, personal property and office fixtures, were sold by the sheriff of Hamilton county. On the 26th of May, 189, proceedings in bankruptcy were begun against the company by the Western German Bank, and on July 11, 1899, the adjudication was made. Sometime after, it does to appear when, Mr. Taft was enjoined by the trustee from paying his notes to other parties than the trustee.

C. Crane & Co. are, and have for many years, been engaged in the lumber trade at Cincinnati. The Maxwell Co. had been doing business with Crane & Co. for a long time. Between the 20th and 25th of April, 1899, the company was indebted to Crane & Co. in the sum of 422.30 on two overdue notes given in settlement of account, one of the notes having matured December 18, 1898, and the other March 18, 1899. During these two dates in April, 1899. Mr. Maxwell called upon the Crane Company, with one of the Taft notes to his company, for $900, due September 11, 1899, and offered to pay his indebtedness to the Crane Company, if Mr. Crane would discount the Taft note and pay to him, Mr. Maxwell, the difference in cash.

To this Mr. Crane assented and the transaction was consummated. Mr. Maxwell receiving the difference in cash between this indebtedness and the discount and the Maxwell Co.'s Taft note, and C. Crane & Co receiving the said Taft note. On the 25th of May, 1899, Crane & Co. discounted the Taft note with the Fourth National Bank. Mr. Clinton Crane was the only witness offered on both sides to testify as to the discount transaction, and the circumstances connected therewith, and to the knowledge possessed by his firm of the condition of the H. C. Maxwell Co.

Now, in view of the actual condition of the Maxwell Co., the two suspicious circumstances connected with the discount transaction are the fact that at that time its notes to Crane & Co. were overdue, one long past due, and the other fact that it might appear somewhat unusual for a concern doing some business to seek discount of a large note from a creditor, when it is customary for reputable business men to seek their banks. An additional suspicious circumstance is that he knew, by the circular sent around, that the Maxwell Co. was offering to sell its entire stock of lumber. Now, if we look at the other side of the picture, we have Mr. Crane's testimony that it was nothing unusual for lumbermen, or people buying lumber, to default in the prompt payment of their notes, and that in his business it was an everyday practice of his to discount paper for his customers, or accept paper from them and credit it

[COPYRIGHT, 1901, BY CARL G. JAHN.]
VOL. 8—5

on his accounts. As to the lumber sale by the Maxwell Co., he says that it was a public auction sale. As to the levy upon the plant, he never knew anything about that until the protest of the note in controversy; in fact, that time was the first he ever knew that the Maxwell Co. was in any trouble in any way, shape and form. Thus he qualifies by fixing the time at the date when Mr. Taft notified him that he had been enjoined from paying the note. He then testifies that the day Maxwell brought the note in, he told him (Crane) that he was going to quit the business; that he had sold, or made arrangements to sell, the machinery to some one, a carriage factory he thought. Mr. Crane says the excuse was reasonable, for all the Cincinnati mill men were complaining at that time: there was no money in the business, because goods could be shipped in here cheaper than the home men could make them. He further testifies that he considered the Maxwell Co. financially good from February to May, 1899; that he did not know of the Johnson & Co. judgment, nor that they had been sued by Fuller & Rice; and this was about all the evidence offered, no one being called to show other facts or to contradict Mr. Crane.

Now, assuming that the mind of the court is the mind of the ordinary intelligent man, it is my duty to place myself in Mr. Crane's shoes, at the time this transaction took place, and say whether the facts that were known to him then were such facts as were calculated to produce a belief that this company was insolvent. The court can not in a conscientious discharge of its duty say they were. There are two strongly suspicious circumstances that might control if unexplained, but to my mind they have been so explained, by Mr. Crane, by the conduct and custom and practice of his own business.

The solution of the question is purely in the weighing of the evidence introduced, the balancing of the probabilities to be inferred from the circumstances. To my mind the evidence has not taken the case beyond the domain of suspicion, and that, according to Justice Bradley, is not sufficient.

The judgment will be for Crane & Co.

Peck, Shaffer & Peck, for Peck, Trustee.

C. W. Baker, for C. Crane & Co.